Mead Nursing Home, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

540

Argued April 8, 1981, before Judges MENCER, WILLIAMS, JR. and CRAIG, sitting as a panel of three.

*Paul D. Shafer, Jr., Shafer, Dronhaffer, Swick & Bailey,* for petitioner.

*Bruce G. Baron,* Assistant Attorney General, for respondent.

OPINION BY JUDGE MENCER, June 8, 1981:

Mead Nursing Home (facility) has appealed from a decision of the Department of Public Welfare (DPW) which disallowed reimbursement for employee meals and certain interest expenses under the Pennsylvania Medical Assistance Program, Section 441.1 *et seq.* of the Public Welfare Code, Act of June 13,

1967, P.L. 31, *as amended,* 62 P.S. §441.1 *et seq.* We affirm.

The facility is wholly owned by Mead Nursing Home, Inc. (corporation), a corporation-for-profit organized under the Business Corporation Law, Act of May 5, 1933, P.L. 364, *as amended,* 15 P.S. §1001 *et seq.* The facility is entitled to reimbursement from DPW for the allowable costs of providing health care services. Allowable costs are defined in the "Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities" (Manual) published at 8 Pa. B. 2832 (1978). Following its fiscal year ending June 30, 1977, the facility requested reimbursement for certain costs, including $20,046.75 for employee meals and $59,811.81 for interest paid under the terms of a stock redemption agreement. DPW disallowed reimbursement for these two items.

## I. Employee Meals

The request for reimbursement for employee meals was based solely upon a lump sum figure determined by a DPW audit as the cost of all meals provided to employees. The facility did not provide any evidence to indicate which employees ate the meals, when the meals were provided, or whether the provision of meals was related to patient care.

Section IV F(1)(k) of the Manual specifically excludes employee meals from the determination of allowable costs, but employee salaries and fringe benefits may be reimbursed as allowable costs under Section IV C(1). Therefore, to receive reimbursement, the facility was required to establish that the employee meals were provided as bona fide fringe benefits.

Section III B of the Manual requires that "[p]roviders are required to maintain adequate financial records and statistical data for proper determination of costs payable under the program." Since the

facility failed to maintain such records and failed to introduce any evidence to support its claim, the denial of reimbursement for employee meals must be upheld.

## II. Interest Expense

In order to determine whether the interest expense claimed by the facility should have been treated as an allowable cost, it is necessary to take a close look at the nature of the transaction. Prior to November 18, 1975, the corporation's stock was closely held by four individuals. On that date, the corporation entered into a stock redemption agreement to purchase the shares of three of those stockholders for the aggregate sum of $900,000 plus interest.[1] The hearing examiner for DPW concluded that the stock redemption agreement constituted a sale of stock from three shareholders to the fourth, but the record does not support this "finding."[2] The evidence conclusively established that the three shareholders sold their stock directly to the corporation. The fourth shareholder *did* gain control of the corporation, but

---

[1] Interest was payable at the rate of 7 percent per annum for the first year and then was to be set for each succeeding year at a rate equal to the prime interest rate set by the First National Bank of the City of New York. The monthly payment was set at $2,200.61, to be applied to interest on the unpaid balance and then to principal.

[2] The hearing examiner included this conclusion in his findings of fact. Generally, where a material finding of fact is at variance with the evidence, we are required to remand. *See Tyler v. Unemployment Compensation Board of Review*, 39 Pa. Commonwealth Ct. 534, 395 A.2d 1045 (1979). In this case, however, the question involves a legal interpretation of the effect of a written document which is not ambiguous. Nothing would be gained by a remand, which would merely add additional delays to the ultimate disposition of the case. Therefore, we have proceeded to decide the case on its merits. *See Williams v. H. E. Stoudt & Son, Inc.*, 404 Pa. 377, 172 A.2d 278 (1961).

some important legal ramifications arise from the form of the transaction.

The terms of the agreement required that the shares be placed in the hands of an escrow agent. The corporation is required to make monthly installment payments for twenty years with the remaining balance to be paid at the end of that period. After the corporation has rendered payment in full, the escrow agent will deliver the shares of stock to the corporation. The three shareholders who are "redeeming" their stock have agreed that the fourth shareholder will exert total control over the corporation in the interim.

We are not certain whether the stock redemption agreement provided for a true redemption, resulting in cancellation of the stock, or whether the shares were acquired as treasury stock which could be resold at a later time. This distinction is irrelevant to the present controversy, however, since the result is the same either way; the corporation did not acquire any assets or property but merely cancelled a preexisting obligation and replaced it with another. In effect, the corporation realigned its capital structure. The determinative issue, then, is whether the interest payable as a result of this realignment is an allowable cost under the Manual. We hold that it is not.

This is a case of first impression for our Court, and the few decisions from other jurisdictions cited by the parties are inapplicable because they deal with actual *sales* of stock to third parties, usually in the context of an acquisition of assets by a service provider. Therefore, we must look exclusively to the Manual for resolution of the issue.[3]

---

[3] The parties have also cited references in the Code of Federal Regulations and something cryptically cited as "HIM." The Code of Federal Regulations has not been adopted by reference by DPW and therefore may not be binding in disputes between DPW

Section IV D(10) of the Manual provides that certain interest expenses may be treated as allowable costs if they meet eight general conditions. The conditions which could apply to the present case read as follows:

10. Interest allowance.

a. Necessary and proper interest on both current and capital indebtedness is an allowable cost. However, there will be an upper limit on capital interest of 3 points above the prime interest rate at the time funds are borrowed.

b. Interest incurred on a loan made to satisfy a financial need of the facility will be recognized. Loans which result in excess funds or investments will not be considered necessary.

. . . .

d. Interest incurred on a loan made for a purpose reasonably related to patient care will be recognized.

*Id.* Interest paid pursuant to the stock redemption agreement does not satisfy any of these conditions.

The "refinancing" of the corporation may have been undertaken by the shareholders and directors for sound business reasons, but there is no indication that it was "necessary" in order for the facility to con-

---

and the facility. We need not decide this issue, however, because the essential terms of the federal regulations are also present in the Manual. We cannot find any reference to "HIM" in either the federal or state regulations, so we are forced to conclude that it could only be applicable, if at all, as a part of a contract between DPW and the facility. Neither party has made "HIM" a part of the record, so we have not considered its provisions in the resolution of the case. Of course, any provision of "HIM" which contradicts a valid law or regulation would be invalid, so consideration of its provisions would not alter the outcome of this case.

tinue providing services.[4] For this reason, the interest was not an allowable cost under Section IV D(10)(a).

Similarly, it has not been established that the refinancing of the corporation satisfied any financial need of the facility. Indeed, it has never been alleged that either the facility *or* the corporation suffered from any identifiable financial need. Thus, the interest was not an allowable cost under Section IV D(10)(b).

Finally, the facility has argued that the interest should be treated as an allowable cost relating to patient care under Section IV D(10)(d) because the effect of the stock redemption agreement was to eliminate dissention among the four shareholder-officers of the corporation and thus *increase administrative efficiency.* We reject this contention. The removal of three shareholders from management positions may have had some tangential effect on the efficiency of the facility, but the *purpose* of the stock redemption agreement was to secure the investments of its shareholders. This purpose was totally unrelated to patient care, and DPW was correct in determining that the interest paid pursuant to the agreement was not an allowable cost for purposes of reimbursement.

Therefore, we enter the following

ORDER

AND Now, this 8th day of June, 1981, the order of the Department of Public Welfare, dated May 28,

---

[4] If the corporation had originally been capitalized by a stock issue subject to mandatory redemption, then it is possible that the interest on the funds used for redemption could be considered "necessary." In such a case, however, these financial arrangements would have been submitted to a Health Systems Agency for review under 28 Pa. Code §301.1 *et seq.* before the facility began providing services.

546

1980, which denied reimbursement to the Mead Nursing Home for employee meals, in the amount of $20,046.75, and for interest expenses, in the amount of $59,811.81, is hereby affirmed.